UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM C. COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-00962-RBW |
| | ) | |
| LOCKHEED MARTIN CORPORATION, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| | ) | |

## VERIFIED AMENDED COMPLAINT
### (Race Discrimination under Title VII)

### A. JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action under 28 U.S.C. §§1331 and 1332 because the Amended Complaint alleges violations of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e-5(f).  Also, the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

2.      Venue properly lies within this District pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1391 because Defendant Lockheed Martin's allegedly unlawful actions against Plaintiff occurred within this judicial district.

### B. THE PARTIES

3.      Plaintiff William C. Cook is a resident of Alexandria, Virginia, and a former employee of Defendant Lockheed Martin Corporation.

4.      He was an "employee" of Defendant, as defined by Title VII, 42 U.S.C. § 2000e(f).

5.      Defendant is incorporated under the laws of Maryland and has its principal place of business in Bethesda, Maryland.

6.      Defendant is an "employer," as defined by Title VII, 42 U.S.C. § 2000e(b).

## C. THE FACTS SUPPORTING PLAINTIFF'S CLAIMS

7.      Plaintiff is an African-American.

8.      Plaintiff's initial affiliation with Defendant Lockheed Martin occurred between 1996 and 2003, when he worked for two of its subcontractors over that period of time.

9.      Plaintiff's prior association with Defendant, working with the same programs and many of the same personnel, made him very qualified to perform acquisition logistics work for Defendant.

10.     During these previous periods of employment with Defendant's subcontractors, Plaintiff was recognized by his managers and clients for his excellent performance, as indicated by his performance evaluations, salary increases, and bonuses.

11.     The Federal Aviation Administration (FAA) is an affiliate agency of the U.S. Department of Transportation.

12.     Under the provisions of the Federal Acquisition Regulations, the FAA conducted an open competition for the procurement of engineering and technical services to support and maintain the National Airspace System (NAS).  Defendant won this contract and is currently providing services for the FAA under it.

13.     On or about July 2, 2008, Defendant hired Plaintiff as a member of its Logistics Management staff in the Information Systems & Global Services Division (IS&GS) in Washington, D.C.

14.     Plaintiff started work for Defendant on or about July 23, 2008.

15.     Plaintiff's starting salary was $87,000/year.

16.     Plaintiff's first direct supervisor was Gerry Canas, Task Order Manager (TOM).

17.     On or about July 30, 2008, Mr. Canas formally appointed Plaintiff Team Lead of the NAS Integration Contract (NISC) Power Services Group (PSG) Logistics Support Team.

18.     The NISC PSG Logistics Team was responsible for logistical support planning for the FAA's Power Services Group (AJW-22).

19.     The FAA PSG (AJW-22) Management Team had nine program managers under their supervision.  Most of these managers were physically located in Oklahoma City, OK, with at least one in Seattle, Washington.  These managers made periodic visits to the Washington, DC headquarters office and held weekly or bi-weekly teleconferences to coordinate support for their programs.

20.     In his capacity as Team Lead, Plaintiff was responsible for the coordination, resolution, and conduct of logistical support requirements for the entire range of secondary or backup power programs for the FAA's Power Services Group (AJW-22), in addition to training support and contracts development.

21.     As of July 2008 the four Team Leads of the NISC Power Services Group were Curtis Troy (caucasian), Implementation Support; Nicole Lowry (black), Financial Management; Alan Anderson (caucasian), Fuel Storage Program; and Plaintiff.

22.     Mr. Cook replaced Ms. Brenda Stingley-Shaid (black) as Team Lead.

23.     Jay Rupp (white), Program Manager for the Power Services Group (AJW-22), managed the operational readiness of the National Airspace System's backup power infrastructure through his staff, including Russell Green, Acquisition, Transition and Integration Manager (FAA AJW-221).

24.     As Team Lead, Plaintiff presented monthly logistics briefings to Mr. Rupp.

25.     Later, Mr. Rupp delegated the presentation duty to Mr. Green.

4

26.     Representatives of the FAA Logistics Center and other stakeholder organizations participated in the briefings by teleconference

27.     During a teleconference on or about August 25, 2008, Mr. Green assigned Mr. Cook to write a technical issue paper on program training, focusing on the Government's high reliance on commercial training, as opposed to FAA training at its Academy in Oklahoma City.

28.     This assignment was a "personal service," since it was a direct staff assignment by Mr. Green, an FAA employee, not by Plaintiff's NISC managers.

29.     A "personal service," in Defendant's vocabulary, was any task request for services that did not come through the contractor's management.

30.     For properly authorized tasking, the client (FAA) would identify the requirement and make the request to the appropriate program management official (i.e., Program Manager or Task Order Manager) of Defendant.  The program management official then identified and/or allocated the personnel resources for completing the task.

31.     More importantly, Mr. Green should have directed any issue pertaining to FAA training to his colleagues in the Technical Training and Development Group, AJL-12, not to Plaintiff.

32.     In any event, on or about September 9, 2008, Plaintiff circulated a draft of that training issue paper to several senior members of the Logistics Team (Andrew Reid, Kathie Collison, and Floyd Pugh) for comment and review.

33.     On or about September 10, 2008, Mr. Reid and Ms. Collison provided Plaintiff with suggested revisions to the paper and praised the quality of his work product.

34.     That same day, Plaintiff e-mailed the finalized issue paper to Mr. Green, Andy Guadiana, Vanessa Dixon, and Mr. Canas, with courtesy copies to Mr. Rupp and Chauncey

Woodland.  Since the assignment was a personal service and not an authorized task, Plaintiff did not circulate the paper through his chain of command before sending it.

35.    On or about September 12, 2008, Ms. Dixon, FAA Program Manager for Power Systems/HVAC Training (AJL-12), responded to the e-mail, directing her comments towards FAA Program Managers Jay Rupp and Russell Green, and indicated that there were some factual inaccuracies in the paper.

36.    Ms. Dixon then sent a separate e-mail directly to Mr. Rupp and Mr. Green, expressing her "[disappointment] with the unsubstantiated allegations and insult on this office and [herself]."  Ms. Dixon noted that since "[Plaintiff] has only been here a short time, the allegations had to come from various sources."

37.    Mr. Green immediately responded to Ms. Dixon's e-mail and indicated that "this document is not the official position of the Power Services Management Team."

38.    On September 16, 2008, Plaintiff's supervisor, Mr. Canas, approached him and advised Plaintiff always to forward task assignments, even personal services, to him and the assigning client in the future.

39.    Mr. Canas agreed with Plaintiff's assessment of the incident, including the inappropriate manner of the tasking and the accuracy of paper.

40.    Plaintiff then considered this matter to be resolved.

41.    On or about October 22, 2008, Mr. Canas gave Plaintiff a performance review for January 2008 to December 2008.  The Overall Assessment was that Plaintiff was a Successful Contributor.

42.     At the same time, after only three months of employment by Defendant, Mr. Canas also awarded Plaintiff a meritorious salary increase for his successful performance, effective February 23, 2009.

43.     Plaintiff's accomplishments in 2008 included the following:

a)   A total revision of the Logistics Briefing and coverage of all PSG program in all areas of logistics and training support;

b)   Update, approval and (network) posting/distribution of the Uninterruptible Power Supply (UPS) Integrated Logistics Support Plan (ILSP);

c)   Update, approval and posting/distribution of the Battery Replacement ILSP;

d)   Update, approval and posting/distribution of the DC BUS ILSP;

e)   Update and review of the Critical Power Distribution System ILSP;

f)   Update and review of the Engine Generator ILSP; and

g)   Preliminary update of the ILSP for the ARTCC Critical/Essential Power System (ACEPS).

44.     On or about March 30, 2009, Plaintiff listed his performance goals for the year 2009 in an e-mail to Mr. Canas.

45.     From September 16, 2008, until June 2009, Defendant did not take any further issues with Plaintiff's tasks or written communications.

46.     On or about June 5, 2009, Plaintiff e-mailed Robert Blanchette, Senior Electrical Engineer for FAA, as suggested by Task Order Manager Gerry Canas, and asked him to identify the proper designation and configuration for a power system being installed at two facilities. Plaintiff needed to identify the proper designation and configuration for the power system at the

Atlanta ATCT and NADIN/NNMC facilities in order to address their logistics support requirements. Plaintiff provided Mr. Blanchette with responses that he had received from two other individuals that contained conflicting information and asked for his input to help resolve the discrepancy.

47.   On or about June 8, 2009, Mr. Blanchette responded to Plaintiff's e-mail, noted his confusion at the discrepancy, and attempted to address Plaintiff's question. Mr. Blanchette also added Richard Rochester (an FAA subordinate of Mr. Green) to the e-mail exchange to obtain his input.

48.   Mr. Rochester intervened by replying to Mr. Blanchette's memo. Instead of addressing system configuration, he discussed system certification and testing. He continued by falsely accusing Mr. Cook for coming up with a separate plan of action and advising that "Bill needs to discuss these topics interally" (sic).

49.   Plaintiff forwarded both Mr. Blanchette's and Mr. Rochester's response to Mr. Green to alert him to the discrepancy and obtain his assistance in resolving the issue.

50.   On or about June 8, 2009, Mr. Green then forwarded the entire e-mail exchange to Mr. Canas, Plaintiff's supervisor, and criticized Plaintiff for communicating with personnel outside the Power Services Group, causing confusion and negative feedback. Mr. Green stated, "There have been a few examples in which [Plaintiff] has communicated with personnel outside of Power Services and caused confusion or negative feedback. . . . . I am requesting that Chauncey, you, and I meet with [Plaintiff] to discuss this."

51.   Mr. Green's accusation that Plaintiff had a history of causing "confusion or negative feedback" was unfounded and unwarranted.

52.     Later, on or about June 8, 2009, Mr. Canas responded to Mr. Green's e-mail and was supportive of Plaintiff.  Among other things, Mr. Canas wrote, "I see no instance of Bill suggesting a separate plan of action.  I DO see where he is simply inquiring as to what the site thinks they are getting so he (a logistician) can identify what will be needed to support the fielded system."

53.     Between August 2008 and May 2011, Plaintiff continued to experience an increased level of scrutiny and involvement by upper-level management, particularly with regard to his e-mail communications with his subordinates and peers.

54.     On the afternoon of August 26, 2009, Janet Schweinfurth of Defendant's Power Services Group, e-mailed Plaintiff, "[I]f you have not yet forwarded me a copy of your most current resume, please make all efforts to do so by noon on Thursday, August 27th."

55.     This request for his resume and its stated deadline presented a conflict with a contractual deliverable for Plaintiff.

56.     Further, on July 22, 2009, over a month earlier, Plaintiff had already responded to a previous request for biographies and resumes from Rita Maxwell, Administrative Assistant, Human Resources Office.

57.     Plaintiff responded: "Janet. "Give me a break. Tuesday at the earliest."

58.     On August 28, 2009, Richard (Dick) LaFrance, Operations Manager and Plaintiff's second-line supervisor, sent an e-mail to Plaintiff, criticizing his e-mail response to Ms. Schweinfurth's request for the team's resumes.

59.     Although Mr. LaFrance did not have Mr. Cook's e-mail, for he had deleted it, he chastised Mr. Cook for his response, characterizing it as "negative" in tone and "unprofessional and unkind."  He further suggested that Mr. Cook apologize for his "thoughtless note."

60.     Mr. LaFrance's characterization of Plaintiff's August 26 e-mail was unfounded, for it was not "negative," "unprofessional," or "unkind."

61.     In September 2009, Mr. Canas was unceremoniously removed as Task Order Manager and Plaintiff's immediate supervisor.

62.     Also, in about September 2009, Defendant appointed Mr. LaFrance as Task Order Manager, in addition to his current position as Operations Manager.

63.     Mr. LaFrance then became Plaintiff's first-line and second-line supervisor.

64.     As Operations Manager, Mr. LaFrance supervised 18 Team Leads within the NISC Power Services Group.

65.     At various times the Team Leads under Mr. LaFrance were: (1) Curtis Troy (white); (2) Gerry Canas (white Hispanic); (3) Alan Anderson (white); (4) Diana Henry (white); (5) Gordon Collier (white); (6) Chuck Herbolsheimer (white); (7) Nicole Lowry (black); (8) Natalie Scott (black), who succeeded Nicole Lowry; (9) Kate Wotoywich (white); (10) John Bernhardt (white); (11) Hank Jacocks (black); (12) Gerald Nugent (white); (13) Phillip Thomas (black); (14) Duff Means (white); (15) Ben Wisbisono (Asian); (16) Jose Cabrita (Latino); (17) Robert Fontaine (white); and (18) Plaintiff.

66.     On or about September 11, 2009, with Mr. Canas no longer Plaintiff's first-line supervisor, Mr. Green renewed his June 8, 2009 complaint against Plaintiff and escalated it to Mr. LaFrance.

67.     That same day, Mr. LaFrance e-mailed Plaintiff and advised him to "avoid lengthy and critical msg ... and avoid going outside of PSQ HQ circle."

68.     Mr. LaFrance's directive was inappropriate because the nature of Plaintiff's position, as a logistician and a team leader, required him to communicate with a variety of contractors and FAA employees all over the country without prior approval.

69.     Mr. LaFrance's directive was clearly discriminatory because Plaintiff was the only team lead within Mr. LaFrance's chain of command to whom he issued such a directive.

70.     On September 19, 2009, Mr. LaFrance e-mailed Plaintiff and admonished him for the August 2008 training issue paper, which Plaintiff had completed the previous year.  Mr. LaFrance instructed Plaintiff to "improve [his] communication skills" and instructed Plaintiff to see him the following Tuesday.

71.     On September 22, 2009, Mr. LaFrance met with Plaintiff and counseled him about the training issue paper.  Mr. LaFrance stated that Mr. Green found Plaintiff's style of written communication "disturbing" and that Mr. Green referred specifically to the training issue paper.

72.     Plaintiff replied that he thought the issue was resolved a year earlier.

73.     Mr. LaFrance added that even if clients did not say anything directly to Plaintiff, they will bring it to Mr. LaFrance's attention. He concluded by warning Plaintiff to be very careful about his written communications in the future.

74.     Mr. LaFrance's insistence on counseling Plaintiff for an incident which happened a year earlier and which had already been resolved showed his hostility towards Plaintiff.

75.     From that point until Plaintiff's termination, Defendant's management continued to subject Mr. Cook's written communications to intense scrutiny, criticisms, and unfounded counselings.

76.     For instance, on October 5, 2009, Plaintiff e-mailed his team member, Floyd Pugh, courtesy copies to Mr. LaFrance, and Anthony Messina, to inquire about the status of a task.  Mr. Pugh was not at his desk then.

77.     Mr. LaFrance responded to the e-mail by admonishing Plaintiff for sending an e-mail to Mr. Pugh, instead of going to his cubicle and speaking to him directly.  He also indicated that he would set up a meeting with Plaintiff and Laurin Mathson, Human Resources specialist, to discuss the communication.

78.     Plaintiff responded by pointing out that Mr. Pugh was not at his desk then and in fact did not come to work that day.

79.     Mr. LaFrance did not respond to Plaintiff's explanation of why he sent Mr. Pugh an e-mail.

80.     Essentially, Mr. LaFrance sought any and every opportunity to criticize Plaintiff and subject him to unwarranted ridicule.

81.     On December 1, 2009, Plaintiff responded by e-mail to a question from Pamela Curry, FAA Branch Manager, Systems Engineering, regarding a new logistician on Plaintiff's team.

82.     Plaintiff forwarded Ms. Curry a chart depicting tentative logistics team assignments, "pending management approval."

83.     Later that day Mr. LaFrance sent Plaintiff an e-mail, criticizing him for providing Ms. Curry with the requested information because he considered it a "Personal Service."

84.     Among other things, Mr. LaFrance stated:

You should not be asking the FAA for "management approval," for Noel's assignment.

You and I should have met so that we could digest your recommendations. The next step would have been for the TOM (me) to notify the FAA regarding the logistics assignment. The FAA is not in your management chain.

I will assume some part of the blame for this misstep since I should have been ahead of this.

85.     He misunderstood Plaintiff's reference to "management approval," for Plaintiff meant approval by Defendant's management, not FAA management.

86.     On December 18, 2009, Plaintiff received his 2009 Annual Performance Evaluation via the LMPeople website.

87.     Although he was Plaintiff's supervisor for only three months, Mr. LaFrance rated Plaintiff as merely a "basic contributor," the second to lowest rating available.

88.     This rating was unjustified because of Plaintiff's numerous accomplishments.

89.     Plaintiff's accomplishments in 2009 included the following:

  a.   Resolved the issue of an inoperable transmitter at the Reno, NV International Airport that averted the potential for a service outage affecting air traffic operations;

  b.   Developed an Electrical Line Distribution (ELD) site survey questionnaire that focused on logistics support planning criteria for the Miami and Ft. Lauderdale, Fl airports;

  c.   Developed logistics requirements for the ELD contract Statement of Work, which delineated specific support requirements for the winning contractor;

  d.   Developed a spreadsheet for capturing configuration management data for each project site, which could be converted into an interactive database

that facilitated configuration management, standardization, and quality assurance; and

e. Completed the FAA's Acquisition Management System (AMS) Statement of Work Generator Demonstration Course.

90. Also, Plaintiff's team was understaffed, and several members had marginal skills.

91. Defendant constantly ignored the understaffing of the Logistics Team, which resulted in a disproportionate workload to Plaintiff and his staff.

92. Plaintiff made several requests to Mr. LaFrance for additional staff, both in person and by e-mail.

93. Specifically, on September 23, 2009, Plaintiff e-mailed Mr. LaFrance and informed him, "Based on various program projections, the demands on the logistics support staff are going to increase exponentially.  We have been understaffed with current requirements for quite some time prior to my arrival."

94. Plaintiff also highlighted staff deficiencies in each monthly briefing to NISC PSG Management and FAA Clients.

95. By contrast, management addressed any personnel requests by other Team Leads on a priority basis.

96. That same day (December 18, 2009), Plaintiff requested a formal appeal review of his 2009 Annual Performance Evaluation via the LMPeople Kiosk.

97. On or about February 10, 2010, Plaintiff left a voice-mail for Tamar Becks, Human Resources Manager, seeking guidance on the process for requesting a formal appeal of his performance evaluation.

98.     On or about February 12, 2010, Plaintiff counseled Kathie Collison (caucasian), one of his team members, on the amount of time she was spending in reviewing FAA travel requests, a personal service that she began doing without prior approval.  This task was not logistics work, and it was not authorized by Plaintiff or NISC management.

99.     However, Mr. LaFrance supported Ms. Collison's "initiative" to review FAA travel requests.

100.     Mr. LaFrance did not criticize Ms. Collison for performing a personal service.

101.     By contrast, Mr. LaFrance previously criticized Plaintiff for an alleged "personal service."

102.     This was another example of race discrimination by Mr. LaFrance towards Plaintiff.

103.     There were many steps in the process by which Defendant's supervisors evaluated their subordinates.  The process it was basically as follows:

    a.  Using the S.M.A.R.T (Specific, Measurable, Attainable, Relevant and Time Bound) model employees submitted their goals and objectives for the next performance period to their Task Order Manager for review and approval.

    b.  Upon approval, the employee then entered their goals and objectives into the preliminary performance evaluation form via the LMPeople Kisok website.

    c.  Later, during a period of "Interim Assessment," the goals and objectives may be modified or adjusted, based on changes in tasking, program direction, or other circumstances that may impact performance and their accomplishment.

15

d.  Then the employee completed the "Results and Demonstrated Behaviors" section of the performance evaluation, indicating whether they accomplished the approved goals and objectives.

e.  Next, the designated Task Order Manager evaluated the employee's performance, making several category ratings and an overall performance rating. These ratings were then posted on LMPeople for employees' review.

f.  Next, the Task Order Manager and employee met to discuss the performance evaluation.

g.  The employee verified that such meeting has been completed on LMPeople.

h.  The Task Order Manager then made a salary review determination based on the employee's performance evaluation.

i.  Finally, during another private meeting between the Task Order Manager and the employee, a Compensation Notification would be presented to the employee. This notification indicated current and increased annual salary, percentage of increase, date of assessment, and the effective date of increase.

104.    On or about March 24, 2010, Plaintiff e-mailed Ms. Becks, requesting to meet with her regarding his performance evaluation and the appeals process.

105.    On or about March 25, 2010, Mr. Cook submitted his goals and objectives for 2010 to Mr. LaFrance via e-mail.

106.    On about the same date Mr. LaFrance indicated his approval of Mr. Cook's goals and objectives via e-mail.

107.    On or about March 26, 2010, Plaintiff notified Mr. LaFrance, via e-mail, that he was requesting a review of his 2009 performance rating.

108.    Mr. LaFrance responded that he could not change Plaintiff's performance rating, because the overall ratings were "quota driven." However, Mr. LaFrance offered to write a letter to Human Resources indicating that Plaintiff's performance merited a higher rating.

109.    On March 31, 2010, Plaintiff met with Ms. Becks to discuss his appeal. However, Ms. Becks simply encouraged him to post his 2010 performance goals and objectives to LMpeople and suggested they talk about the appeal at a later date.

110.    Following the meeting with Ms. Becks, Plaintiff posted his performance goals and objectives to the LMPeople Kiosk.

111.    Defendant never again addressed Plaintiff's request to appeal his 2009 performance evaluation and rating.

112.    On or about April 2, 2010, Ms. Becks e-mailed Russ Zubb, NISC PSG Program Manager and Mr. LaFrance, falsely indicating that Plaintiff was the only employee who had not submitted his 2010 performance objectives and goals.

113.    On or abut April 5, 2010, Plaintiff notified Ms. Becks, Mr. Zubb, and Mr. LaFrance that his objectives and goals were posted as of March 31, 2010.

114.    On or about August 15, 2010, Mr. LaFrance gave Plaintiff an "interim" performance appraisal for the period of January 1, 2010, to June 30, 2010. However, Mr. LaFrance did not give Plaintiff an overall assessment rating. Instead, Mr. LaFrance noted:

> Bill is doing a good job of providing logistic support to his many customers in Power Services. He is knowledgeable concerning requirements and pro-active in getting the job done. Power Services is a varied and complex task order and there are many logistics tasks that must be addressed. Bill does a very good job of looking after the logistics requirements of over 9 separate programs. This is

particularly noteworthy since Logistics generally does not enjoy a very high priority within the FAA.

115.   On or about September 29, 2010, Mohammed Elgazzar, FAA Senior Systems Engineer, called Plaintiff and requested that Plaintiff and his team draft a logistics support document.

116.   Plaintiff viewed this request as a personal service and explained to Mr. Elgazzar that his team was working on more time sensitive matters so he would have to get back to him on the project.

117.   However, Mr. Elgazzar was irate and demanded that Plaintiff interrupt his current priorities and address his request.  Mr. Elgazzar said that the assignment would "only be a few pages."

118.   Plaintiff repeated that he would have to get back to Mr. Elgazzar when he had time to discuss the matter and ended the conversation.

119.   On or about September 30, 2010, Mr. Elgazzar alleged to Mr. Rupp that Plaintiff had treated him discourteously during the phone call.

120.   Mr. LaFrance notified Plaintiff that he would set up a time for Plaintiff, Mr. Elgazzar, and himself to resolve the issue and establish a time period for completing the required task.  However, Mr. LaFrance never scheduled the meeting.

121.   On or about September 30, 2010, Plaintiff e-mailed Laurin Mathson, complaining about Mr. LaFrance's for his constant criticisms and admonishments of Plaintiff, which became more frequent during periods leading up to the next performance evaluation.

122.   Plaintiff believed that this pattern of unwarranted criticism was harassment.

123.   On or about October 1, 2010, Ms. Mathson replied, stating that she did not work on Fridays, but would be available to discuss Plaintiff's concerns on the following Monday, October 4, 2010.  (However, she did not do so until October 25, 2010.)

124.   On or about October 21, 2010, approximately six weeks after Plaintiff submitted his harassment complaint against Mr. LaFrance, Mr. LaFrance issued Plaintiff a "Written Warning Regarding Performance" memorandum.  The memo described alleged issues with Plaintiff's performance and attitude, specifically written communications with colleagues.

125.   Mr. LaFrance also placed Plaintiff on a Performance Improvement Plan (PIP) from October 25, 2010, until November 25, 2010.

126.   As part of the PIP, Plaintiff was instructed to complete required administrative requirements such as: paying his corporate credit card within the 30-day time period; completing his time sheets on a daily basis and to complete required compliance training. Plaintiff was also instructed to improve both the tone and style of his written communications; to include concise, respectful, cordial syntax; and to enroll in a communications training course.

127.   On October 25, 2010, Plaintiff met with Ms. Mathson to discuss his harassment complaint against Mr. LaFrance. Ms. Mathson stated that Mr. LaFrance was Plaintiff's supervisor and that "what he says matters." Ms. Mathson suggested that Plaintiff try wording his written communications differently and that he take a communications training course.

128.   Following their meeting, Ms. Mathson sent Plaintiff an e-mail in which she asserted that Plaintiff could improve his writing in various ways.

129.   The examples she cited in her e-mail were generally trivial or out of context, and overstated any issues in Plaintiff's writing style.

130.    For example, Ms. Mathson took issue with Plaintiff writing "on tomorrow" instead of "tomorrow."

131.    By contrast, Plaintiff's white colleagues were not criticized for grammatical errors in their writing.

132.    On or about November 10, 2010, Defendant appointed Joe Riede as Task Order Manager for the NISC Power Services Group staff.

133.    On or about November 15, 2010, Plaintiff admonished Ms. Collison for failing to complete an assignment over a 30-day period and for submitting it to him for review and completion the day before it was to be delivered, as he was on his way to a doctor's appointment. Plaintiff questioned Ms. Collison on the length of time it took to complete the assignment and noted that Ms. Collison had waited a day before the assignment was due to give it to him for review. Ms. Collison stated that she was busy. Plaintiff responded, "We're all busy. How is this fair to me?" Their conversation concluded, and Plaintiff left to attend his appointment.

134.    After Mr. Cook's conversation with her, Ms. Collison apparently made a dramatic crying scene to Mr. LaFrance, alleging that Mr. Cook had been abusive in his tone towards her.

135.    On November 18, 2010, Mr. LaFrance issued Plaintiff a Final Warning Letter regarding Ms. Collison's accusations. The letter criticized Plaintiff for his allegedly "deficient interpersonal skills" in speaking with Ms. Collison.

136.    On November 23, 2010, Plaintiff submitted a memo to Ms. Becks and Ms. Mathson, refuting the allegations in the Final Warning Letter and denying that he had spoken to Ms. Collison in an abusive or hostile tone.

137.    Neither Ms. Becks nor Ms. Mathson ever responded to Plaintiff's memo.

138.    On or about December 15, 2010, Defendant held a "counseling meeting" for Plaintiff, which was attended by Mr. LaFrance, Mr. Riede, Ms. Mathson, and Plaintiff.

139.    During the meeting Mr. Riede was briefed on Plaintiff's past 'counselings' and current letter of warning.

140.    Plaintiff was portrayed as a problem employee who "snaps at nearly everyone."

141.    At the conclusion of the meeting, Mr. Riede commented, "It seems you are on thin ice."

142.    Later that day, Plaintiff encountered Mr. Elgazzar while enroute to a meeting at the client's office in L'Enfant Plaza.  Mr. Elgazzar apologized to Plaintiff for his complaint, acknowledging that he overreacted.

143.    When he returned to his office, Plaintiff e-mailed Mr. Riede, with a courtesy copy to Mr. LaFrance, notifying him that Mr. Elgazzar had apologized to him.

144.    By December 18, 2010, Plaintiff realized he would not receive a raise in 2010, because inexplicably he did not receive a 2010 performance evaluation.

145.    On or about December 21, 2010, Mr. Riede removed Plaintiff from weekly Engine Generator meetings.

146.    Mr. Riede claimed that the client management had expressed opposition to more than one member from each support team attending program meetings.

147.    However, Mr. Riede did not impose this restriction on other support teams.

148.    Plaintiff was replaced by Ms. Collison in the weekly Engine Generator meetings.

149.    Plaintiff's accomplishments in 2010 included the following:

    a.    Coordinated UPS model 9355 vendor training for 18 FAA technicians from North Carolina to Honolulu.

    b.   Initiated planning for the proper disposal of replaced Engine Generators that had been left at various sites with many containing environmentally contaminating petroleum.

    c.   Completed the "Logistics and Training" provisions in a new Engine Generator procurement contract.

    d.   Developed plan for uninterrupted Engine Generator logistics support between the expiring contract and the interim period leading to the award of the new 10-year follow-on contract.

150.    On February 4, 2011, Mr. Riede invited the team members of only Mr. Cook's team to a weekly Team Lead meeting.

151.    Requesting the present of the logistics team members to a Team Leads meeting undermined Plaintiff as a Team Lead before the other Team Leads.

152.    No other Team Lead was subjected to such blatant indifference.

153.    On or about March 31, 2011, Mr. Riede issued a memorandum to the NISC PSG staff, which announced staff realignments and their respective Administrative/Team Leads.

154.    The memo indicated that Plaintiff and John Bernhardt (a white Project Lead) were placed under the "Administrative Lead" of Phillip Thomas (black), another Project Lead.

155.    However, Plaintiff was a team lead with a subordinate staff, whereas the white employee (Mr. Bernhardt) was merely a project lead with no subordinate staff.  Therefore, Plaintiff's realignment was actually a demotion.

156.    On April 1, 2011, Mr. Riede formally relieved Plaintiff of his role as Team Lead. Mr. Riede stated that Anthony Messina, UPS Program Manager, stated that he "could not trust [Plaintiff's] work."

157.    During the meeting, Plaintiff expressed his disbelief that Mr. Messina's comment was the sole reason for Plaintiff's demotion.  He stated, "That's bull.  Anthony is just blowing smoke out of his ass."

158.    Later that day, Plaintiff sent a memorandum to his team, notifying them that he was no longer their Team Lead.

159.    Plaintiff also e-mailed Mr. Riede and requested two weeks of leave due to exhaustion.  Mr. Riede requested to meet with him the following day.

160.    On April 2, 2011, Plaintiff met with Mr. Riede and modified his request for leave to only two to three days.  Mr. Riede granted his request.

161.    Mr. Riede also informed Plaintiff that Human Resources took exception to his comments during their April 1, 2011 meeting, describing Plaintiff as "lashing out" and being "insubordinate."

162.    Plaintiff disagreed with this characterization.

163.    Mr. Riede agreed, stating that he hadn't taken offense.

164.    On May 6, 2011, during a meeting with Mr. Riede, Ms. Mathson and Ms. Becks, Defendant terminated Plaintiff from his employment.

165.    During the meeting, Ms. Mathson informed Plaintiff that they were meeting to follow up on his so-called "inappropriate" behavior during his April 1, 2011, meeting with Mr. Riede and specifically his use of profanity.  Ms. Mathson added that there had been several counseling sessions with Plaintiff over the year.

166.    These counseling sessions were merely pretexts because they were unwarranted and unfounded, as explained above.

167.   Similarly, Defendant placed Plaintiff on a PIP only six weeks after he complained to HR about Mr. LaFrance's harassing actions.

168.   Ms. Becks then informed him that they had reached the decision to terminate Plaintiff's employment and that his final check and vacation pay would be forwarded to him.

169.   Defendant's stated reasons for terminating Plaintiff were unfounded, and there was no good cause to discharge him.

170.   Upon his termination, Defendant seized Mr. Cook's computer and escorted him from the building.

171.   Since his termination by Defendant and as a result of it, Plaintiff has suffered great economic losses.

172.   In addition, he has suffered from great emotional distress.

173.   Upon information and belief, Defendant engaged in a pattern of discrimination against African-Americans, including African-American team leads.

174.   Upon information and belief, blacks, especially those in leadership positions, experienced race discrimination, that ran the gamut from intense micromanagement, constant criticisms, a hostile work environment, to stigmatization that undermined their effectiveness.

175.   Of these, eleven were white, five were blacks, one was Asian, and one was Latino.

176.   In the period shortly before Mr. Cook's hiring and shortly after his termination, approximately seven black employees were appointed Team Leads.

177.   Upon information and belief, six out of these seven blacks were either removed or terminated, and more than likely replaced by whites.

178.    Black employees appointed as Team Leads disproportionately failed in comparison to white Team Leads.

179.    Defendant tended to micromanage black Team Leads intensely, whereas white Team Leads worked with significant autonomy, latitude, and independence.

180.    The rate of turnover for black Team Leads by demotions and/or terminations generally ran at a ratio of 5:1 to that of white managers and team leaders.

## D. STATEMENT OF PLAINTIFF'S CLAIMS

### Count I:  Race Discrimination
### (Failure to Give Plaintiff a Raise)

181.    Plaintiff adopts and incorporates by reference paragraphs 1-180 above.

182.    Title VII makes it unlawful for an employer to discriminate in employment on the basis of, among other things, race.

183.    As indicated above, Plaintiff is African-American.

184.    Generally Defendant's supervisors on the NISC contract evaluated their subordinates and recommended them for pay raises in December of each year.

185.    As explained above and as Plaintiff discovered in December 2010, Defendant maliciously failed or refused to give Plaintiff a performance evaluation for 2010 or a pay increase in 2010.

186.    By failing or refusing to give Plaintiff a performance evaluation for 2010 and a pay raise in December 2010, Defendant discriminated against him on the basis of his race.

187.    Defendant violated Title VII, 42 U.S.C. § 2000e-2(a), by so discriminating against Plaintiff on the basis of his race.

188.   As a result of Defendant's malicious violations of Title VII, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

### Count II:  Race Discrimination
### (Termination)

189.   Plaintiff adopts and incorporates by reference paragraphs 1-188 above.

190.   On or about May 6, 2011, Defendant maliciously terminated Plaintiff from his employment.

191.   Defendant gave vague reasons for terminating Plaintiff, citing various counseling and Plaintiff's workplace conduct.

192.   However, Defendant's purported reasons for terminating were pretextual.

193.   Plaintiff's conduct was acceptable and appropriate at all times.

194.   Further, Defendant's counseling of Plaintiff was unwarranted, and discriminatory.

195.   In discharging him, Defendant was motivated by discriminatory animus.

196.   By discharging Plaintiff, effective May 6, 2011, Defendant discriminated against him on the basis of his race (African-American), in violation of Title VII, 42 U.S.C. § 2000e-2(a).

197.   As a result of Defendant's malicious violations of Title VII, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

### E.  REMEDIES

198.   WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting him the following relief from Defendant:

a)      A declaratory judgment that Defendant violated Title VII of the Civil Rights Act of 1964;

b)      An order reinstating Plaintiff to his former employment with Defendant in his former or a substantially equivalent position, pursuant to Title VII, 42 U.S.C. § 2000e-5(g)(1).

c)      Back pay, taking into account all intervening cost of living adjustments and reasonable pay raises, including pension contributions associated with the reinstatement, which Plaintiff has lost by virtue of his termination;

d)      Future earnings lost as a result of Defendant's discrimination, pursuant to Title VII, 42 U.S.C. § 2000e-5(g)(1);

e)      Compensatory and punitive damages in the amount of $300,000 under Title VII and 42 U.S.C. §1981a(b)(3)(A) to compensate Plaintiff for the emotional distress, embarrassment, and humiliation Plaintiff suffered and continues to suffer as a result of Defendant's discrimination against him on the basis of his race and to punish Defendant for its malicious violations of Title VII;

f)      Prejudgment and postjudgment interest thereon, effective May 7, 2011, pursuant to Title VII, 42 U.S.C. § 2000e-5(g)(i);

g)      Reasonable costs and attorneys' fees pursuant to Title VII, 42 U.S.C. § 2000e-5(k); and

h)      Such other and further relief as to the Court seems just and warranted.

## F. EXHAUSTION OF ADMINISTRATIVE REMEDIES

199.    On or about October 11, 2011, Plaintiff submitted an Intake Questionnaire to the Equal Employment Opportunity Commission (EEOC), alleging race discrimination by Defendant.

200.   The Intake Questionnaire, as Plaintiff completed it, alleged, *inter alia*, that Defendant engaged in race discrimination against him by applying a double standard to his performance and by discharging him on May 6, 2011, both because of his race.

201.   On or about October 21, 2011, EEOC notified Defendant that Plaintiff had filed a charge of discrimination against Lockheed Martin Corporation under Title VII.

202.   On or about October 27, 2011, Plaintiff signed his EEOC charge of race discrimination.

203.   On or about November 21, 2011, Plaintiff submitted an amended complaint to EEOC with an attachment.

204.   On or about December 8, 2011, EEOC notified Defendant that Plaintiff had filed a charge of discrimination under Title VII against Defendant based on his discharge on May 6, 2011, and sent Defendant a copy of the November 18 charge.

205.   On the same day EEOC sent a copy of the charges to the District of Columbia Office of Human Rights.

206.   Plaintiff's amended charge alleged that Defendant engaged in race discrimination by failing to give him an evaluation for the year 2010 and by terminating him on May 6, 2011.

207.   Among other things, the amended complaint and its attachment explained facts underlying Plaintiff's claim that Defendant discriminated against him by creating a hostile work environment for him, by not giving him an evaluation for 2010, and by terminating him.

208.   On or about December 30, 2011, EEOC issued Plaintiff a Notice of Right to Sue, based on his administrative complaint.

209.   Plaintiff received the notice on or about January 9, 2012.

210.    Plaintiff's original Complaint was filed within 90 days after receiving the aforesaid right to sue notice.

211.    Plaintiff is moving to amend his Complaint to clarify his claims under Title VII.

212.    All of the claims herein were included in the EEOC charge filed on November 21, 2011, or in its amendment.

### G.  JURY TRIAL DEMAND

213.    Plaintiff requests a jury trial on all issues of fact and damages arising herein.

### VERIFICATION

I hereby certify under penalty of perjury that I am the Plaintiff in the above-captioned case; that I have read the foregoing Verified Amended Complaint; and that the facts related herein are true and correct to the best of my knowledge, information, and belief.

Executed at Silver Spring, Maryland, this _21st_ day of September, 2012.


_____
WILLIAM C. COOK

Respectfully submitted,


/s/ Alan Banov
ALAN BANOV, Bar No. 95059
Alan Banov & Associates
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910
301-588-9699; fax:  301-588-9698
abanov@banovlaw.com
Attorney for Plaintiff